EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Estado Libre Asociado de Puerto Rico y el Secretario del Departamento de Hacienda<br><br>Recurridos<br><br>v.<br><br>Supermercados Amigo, Inc.<br><br>Peticionario | Certiorari<br><br>2007 TSPR 39<br><br>170 DPR ____ |

Número del Caso: CC-2005-884

Fecha: 8 de marzo de 2007

Tribunal de Apelaciones:

>Región Judicial de San Juan-Panel IV

Juez Ponente:

>Hon. Charles Cordero Peña

Abogado de la Parte Peticionaria:

>Lcdo. Luis Aníbal Avilés

Oficina del Procurador General:

>Lcda. Doraliz E. Ortiz De León
>Procuradora General Auxiliar

>Lcda. Zaira Z. Girón Anadón
>Procuradora General Auxiliar

Materia: Cobro de Dinero

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estado Libre Asociado de
Puerto Rico y el Secretario
del Departamento de Hacienda

    Recurridos

       v.                       CC-2005-884

Supermercados Amigo, Inc.

    Peticionaria

SENTENCIA

San Juan, Puerto Rico, a 8 de marzo de 2007

El 26 de enero de 2006 expedimos el auto solicitado en el caso de epígrafe para revisar una sentencia dictada por el Tribunal de Apelaciones, en la cual se determinó que Supermercados Amigo, Inc., era importadora de carne de res y por lo tanto, no estaba relevada de la obligación contributiva impuesta durante la vigencia de la Ley Núm. 95 de 29 de noviembre de 1992. Dicho tribunal resolvió que la referida Ley Núm. 95 era constitucional de su faz y que ésta perseguía un fin legítimo gubernamental, a saber: "promover el mercado de la carne de res en un mercado eficiente para asegurar la mejor nutrición a los puertorriqueños."

Las partes han comparecido argumentando sus diferentes posiciones antagónicas. Por estar igualmente dividido el Tribunal se confirma la determinación del Tribunal de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Rodríguez Rodríguez emitieron opiniones disientes. El Juez Asociado señor Rebollo López disiente sin opinión escrita.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estado Libre Asociado de
Puerto Rico y el Secretario
del Departamento de Hacienda

     Recurridos

       v.

Supermercados Amigo, Inc.

     Peticionaria

CC-2005-884

OPINIÓN DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR RIVERA PÉREZ.

San Juan, Puerto Rico, a 8 de marzo de 2007.

El 26 de enero de 2006, este Foro expidió auto de *Certiorari* para revisar una Sentencia dictada por el Tribunal de Apelaciones, mediante la cual dicho foro determinó que Supermercados Amigo, Inc., no estaba exento de la obligación contributiva que le impone la Ley Núm. 95 de 29 de noviembre de 1992 a los importadores de carne de res. El foro intermedio apelativo resolvió que la Ley Núm. 95 era constitucional de su faz toda vez que la misma perseguía un fin gubernamental legítimo. Por estar igualmente dividido el Tribunal se confirma la determinación del Tribunal de Apelaciones. Disentimos de este curso de acción. Entendemos que el caso ante nos es propicio para atender un

tema que surge del caso y controversia, trabado ante el Tribunal de Primera Instancia. Nos referimos a la aplicación a Puerto Rico de la cláusula de comercio interestatal de la Constitución de los Estados Unidos,[1] en su "estado durmiente." Asimismo, es de **particular importancia analizar la base jurídica por la cual el "estado durmiente" de la referida cláusula es aplicable a Puerto Rico**. Por otra parte, resulta imperativo discutir los criterios establecidos por la jurisprudencia federal para determinar si una legislación local viola la cláusula de comercio interestatal de la Constitución federal, en su "estado durmiente", y su aplicación a los hechos del caso de marras. Veamos.

I

El poder del Congreso de los Estados Unidos para regular el comercio interestatal está plasmado en el Artículo I, sección 8, de la Constitución de los Estados Unidos, *supra*. Esta facultad del Congreso federal ha sido objeto de múltiples interpretaciones por parte del Tribunal Supremo de los Estados Unidos, así como por tribunales federales de inferior jerarquía, tratadistas y profesores de Derecho Constitucional.

Desde el 1852, el Tribunal Supremo federal ha señalado que la cláusula de comercio interestatal de la Constitución de Estados Unidos, *supra*, contiene unas limitaciones implícitas al poder de acción de los estados,

---

[1] Art. 1, Sec. 8, Const. Estados Unidos de América.

aun en ausencia de una expresión explícita del Congreso. Este poder implícito bajo la referida cláusula es el que se denomina **"el estado durmiente"** o "negativo" de la cláusula de comercio interestatal.[2]

El Alto Foro federal ha razonado que el propósito central del "estado durmiente" de la cláusula de comercio interestatal es promover la integración económica y prevenir la interferencia local con el flujo del comercio en la Nación.[3] Este razonamiento fue reiterado recientemente en Am. Trucking Ass'ns v. Mich. PSC,[4] cuando el referido Foro expresó que el estado durmiente de la cláusula de comercio interestatal previene que los estados pongan en peligro el bienestar económico de la Nación poniendo trabas al comercio.[5] En esta decisión se reafirmó la doctrina jurisprudencial que enuncia que los estados no pueden imponer contribuciones protectoras de industrias locales que, a su

---

[2] Cooley v. Board of Wardens, 53 U.S. 299 (1852) según citado y analizado en *American Constitutional Law*. Laurence H. Tribe, *I American Constitutional Law,* 3d Ed., Nueva York, Foundation Press., 2000, pág. 1030.

[3] H.P. Hood & Sons, Inc. v Du Mond, 336 U.S. 525, 537-538 (1949).

[4] 545 U.S. 429 (2005).

[5] *Íd*. En este caso el Tribunal Supremo federal expresó lo siguiente: "Our Constitution 'was framed upon the theory that the people of the several states must sink or swim together'. Thus, this Court has consistently held that the Constitution's express grant to Congress of the power to 'regulate commerce...among the several States…' contains a 'further, negative command, known as the dormant Commerce Clause', that 'create[s] an area of trade free from interference by the States'(Citas omitidas).

vez, tengan el efecto de discriminar contra industrias que operan en la esfera del comercio interestatal. Se reiteró que los estados no pueden imponer contribuciones que tienen el efecto inevitable de amenazar el tráfico comercial interestatal, mediante la creación de una "barrera financiera" alrededor del estado impositor.[6]

**Este Tribunal no ha analizado concretamente la aplicación del "estado durmiente" de la cláusula de comercio interestatal de la Constitución federal**, *supra*, **a Puerto Rico, ni la razón por la cual la misma es extensiva a nuestra jurisdicción**.[7] No obstante, ciertas decisiones de este Foro han esbozado criterios cónsonos con los empleados por los tribunales federales para determinar si una legislación estatal es violatoria de la cláusula de comercio interestatal de la Constitución federal, *supra*, en su "estado durmiente."[8]

---

[6] American Trucking Assns., Inc. v. Scheiner, 483 U.S. 266, 284 (1987).

[7] En Marketing and Brokerage Specialists, Inc. v. Secretario de Agricultura, 118 D.P.R. 319 (1987), nos expresamos de la manera siguiente: "Es **innecesario resolver en este caso si la Cláusula de Comercio Interestatal de la Constitución Federal, en su estado durmiente, aplica a Puerto Rico**…Sin embargo, aun si aplicásemos la normativa federal sobre la Cláusula de Comercio, la reglamentación sería válida." (Énfasis suplido). Asimismo, en Iberia v. Secretario de Hacienda, 135 D.P.R. 57 (1993) nos expresamos de la manera siguiente: "Dado que el análisis señalado no aplica al presente caso, es **innecesario pronunciarnos sobre la aplicabilidad de la Cláusula de Comercio (en su "estado durmiente", nota al calce 11) al Estado Libre Asociado de Puerto Rico**." (Énfasis suplido).

[8] Gómez Hermanos v. Secretario de Hacienda, 114 D.P.R. 367 (1983); Banco Popular v. Mun. de Mayagüez, 126 D.P.R. 653 (1990). En este último expresamos que, **bajo los criterios de la cláusula de comercio interestatal, una ley de patentes**

La Constitución de Puerto Rico dispone que el poder del Estado para imponer y cobrar contribuciones y autorizar su imposición se ejercerá según lo disponga la Asamblea Legislativa y nunca será rendido o suspendido.[9] No obstante, esta facultad impositiva debe ser ejercida en armonía con lo que establece la sección 3 de la Ley de Relaciones Federales, a los efectos de que no se hará distinción alguna entre artículos importados de los Estados Unidos y los artículos similares producidos o manufacturados en Puerto Rico.[10]

En opiniones recientes, el Tribunal de Apelaciones, Primer Circuito federal, **ha expresado que el "estado durmiente" de la cláusula de comercio interestatal de la Constitución de los Estados Unidos,** *supra*, **aplica a Puerto Rico de la misma forma que aplica a los estados de la Unión.** Hace una década el referido foro expresó lo siguiente: "Although not a state, **the Commonwealth of Puerto Rico is subject to the constraints of the Dormant Commerce Clause to the same degree as are the**

---

**municipales de Puerto Rico podía ser inconstitucional.** Sostuvimos que al reconocer un crédito se **"aseguraba la constitucionalidad de nuestra Ley de Patentes Municipales ante un ataque de acuerdo con la cláusula de comercio interestatal."** (Énfasis suplido).

[9] 1 L.P.R.A. Art. VI, sec. 2. La facultad impositiva del Estado es amplia y abarcadora según hemos resuelto en Café Rico v. Municpio de Mayagüez, 155 D.P.R. 548 (2001); Continental Insurance Company v. Secretario de Hacienda, 154 D.P.R. 146 (2001).

[10] 1 L.P.R.A., sec. 3.

**states."**[11]    Recientemente, en <u>Walgreen Co., v. Rullán</u>[12], el referido foro judicial, atendiendo una controversia relativa al estatuto local que exigía certificados de necesidad a las personas que interesaran construir o adquirir establecimientos de cuidado de salud, incluyendo a las farmacias, **determinó que la referida legislación violaba el "estado durmiente" de la cláusula de comercio interestatal de la Constitución de los Estados Unidos**, *supra*. En consecuencia, determinó **que la ley local era inconstitucional**.    En dicho caso, el Tribunal del Primer Circuito de apelaciones puntualizó lo siguiente:

> **"The       Constitution       grants Congress   the   power   to   regulate interstate   commerce.**   While   the Commerce Clause's text provides only an  affirmative  grant  of  power,  for over  150  years,  the  Clause  has  been interpreted   to   contain   a   negative aspect  known  as  the  dormant  Commerce Clause.  **The dormant Commerce Clause** <u>**doctrine,   which   applies   to   Puerto**</u> <u>**Rico on the same terms as it applies**</u> <u>**to   the   states**</u>  limit   the   power   of states   to   'erect   barriers   against interstate   trade'"   (citas   omitidas). (Énfasis suplido).

---

[11] <u>United Egg Producers, et al. v. Department of Agriculture</u>, 77 F.3d 567 (1st Cir. 1996).  La aplicación de la cláusula de comercio   a   Puerto   Rico   fue   posteriormente   reiterada   en <u>Starlight Sugar Inc. v. Soto</u>, 253 F.3d 137 (1st Circ. 2001).

[12] 405 F.3d 50 (1st Cir. 2005).  Esta decisión fue recurrida, mediante  petición  de  *Certiorari*,  ante  el  Tribunal  Supremo federal.  **El Más Alto foro federal denegó la expedición del recurso;** <u>Pérez Perdomo v. Walgreen Co.</u>, 126 S.Ct. 1059, 163 L.Ed. 2d 928 (2006).

II

La Sección 3 de la Ley de Relaciones Federales, *supra*, en lo pertinente, dispone de la manera siguiente:

> "…las contribuciones de rentas internas que de acuerdo con la **facultad concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico,** sobre cualesquiera artículos, efectos, mercaderías o mercancías podrá ser impuesta y cobrada sobre los artículos sujetos a dicha contribución, según determine la referida Asamblea Legislativa, tan pronto como los mismos hayan sido fabricados, vendidos, usados o importados en la isla; **Disponiéndose, que no se hará distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico…**" (Énfasis suplido).

Por otra parte, la sección 38 de la Ley de Relaciones Federales, *supra*, dispone que no será aplicable a Puerto Rico **<u>legislación del Congreso</u>** que regule el comercio interestatal.[13] **Concluimos que esta sección de la referida Ley <u>se refiere únicamente a la inaplicabilidad en Puerto Rico</u>**

---

[13] <u>En Sea Land v. Municipality of San Juan</u>, 505 F. Supp. 533 (1980), citando al Profesor Helfeld en *How Much of the Federal Constitution is Likely to be held Applicable to the Commonwealth of Puerto Rico?* 39 Rev. Jur. U.P.R. 169 (1969), expresó lo siguiente: "Finally, we see no reason to conclude that the constitutional policy of prevention of adverse interference of state legislation upon interstate commerce **should not apply to Puerto Rico.** We have found no indication that Congress intended otherwise. Nor can we infer, as did the local Supreme Court in <u>RCA v. Government of the Capital</u> (citas omitidas), that the exemption from, *inter alia*, the Interstate Commerce Act contained in the Federal Relations Act **meant anything more than that.**" (Énfasis suplido).

**de la legislación aprobada por el Congreso de los Estados Unidos sobre el comercio interestatal**[14]**, mas no a la inaplicabilidad en Puerto Rico del "estado durmiente" de la cláusula de comercio interestatal de la Constitución de los Estados Unidos**, *supra*.

En R.C.A. v. Gobierno de la Capital, *supra*, expresamos que la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución de Estados Unidos, *supra*, **no aplica *ex propio vigore* a Puerto Rico**.    Manifestamos lo siguiente: "La contribución aquí en litigio, impuesta en virtud de ley de la Asamblea Legislativa de Puerto Rico, no es contraria a disposición alguna de la Constitución del Estado Libre Asociado.   **Si hubiera algún obstáculo legal para sostenerla habría que buscarlo en alguna disposición, o como consecuencia de alguna disposición, de la Ley de Relaciones Federales.**" (Énfasis suplido).

Se colige de lo anterior que la prohibición que impide que Puerto Rico discrimine en contra de productos importados de los referidos estados **surge por virtud de la voluntad legislativa del Congreso de Estados Unidos, y no por la**

---

[14] Esta Ley es la *Interstate Commerce Act* de 1887.   En R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416, (1964) expresamos lo siguiente: "Es otro hecho histórico que la disposición constitucional que reserva al Congreso el poder de reglamentar el comercio con naciones extranjeras, entre los Estados y con las tribus indias, no sólo no ha regido ni rige por su propia fuerza en Puerto Rico sino que por el contrario, **el Congreso dispuso de manera expresa que no serían aplicables a Puerto Rico la Ley sobre Comercio Interestatal y las varias enmiendas que se hicieron a ella**…" (Énfasis suplido).

**aplicación *ex propio vigore* de la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución federal**, *supra*.

En Examining Board of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572 (1976), el Tribunal Supremo de Estados Unidos expresó que cuando el Congreso federal aprobó la Constitución de Puerto Rico añadió, entre otras cosas, una condición de que cualquier enmienda o revisión de la Constitución de Puerto Rico fuera consistente con las disposiciones de la Constitución de los Estados Unidos.[15] El Alto Foro federal expresó que el propósito de la condición no era otro que dejar establecido lo siguiente:

> "Applicable provisions of the United States Constitution **and the Federal Relations Act will have the same effect as the Constitution of the United States has with respect to State constitutions or State Law."**
> (Énfasis suplido).

Se desprende de lo anterior que **la voluntad legislativa del Congreso** de Estados Unidos tiene en Puerto Rico el mismo efecto que la Constitución federal tiene sobre la Constitución de los estados de la Unión. Es en virtud de tal voluntad legislativa, plasmada en la sección 3 de la Ley de

---

[15] 1 L.P.R.A 8, a la pág. 147; Ley Pública 447, 82do Congreso: Resolución Conjunta aprobando la Constitución del Estado Libre Asociado de Puerto Rico. La referida Resolución Conjunta dispone, en lo pertinente, de la manera siguiente: **"Cualquier enmienda o revisión de esta Constitución deberá ser compatible con la resolución decretada por el Congreso de los Estados Unidos aprobando esta Constitución, con las disposiciones aplicables de la Constitución de los Estados Unidos, con la Ley de Relaciones Federales…"**

Relaciones Federales, *supra*, que Puerto Rico no puede discriminar contra productos importados de los estados de la Unión. En Examining Board of Engineers, Architects and Surveyors, *supra*, el Alto Foro Federal expresó lo siguiente: **"the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union…"**

La decisión de R.C.A. v. Gobierno de la Capital, *supra*, mediante la cual se resolvió, hace algo más de cuatro (4) décadas, que el poder de tributación de Puerto Rico, en cuanto al comercio interestatal, le permite hacer cosas que no le son permitidas a los estados, no se sostiene actualmente ante el desarrollo del ordenamiento jurídico en los tribunales, a nivel federal, y por opiniones de tratadistas de derecho constitucional.[16]

---

[16] En Starlight Sugar, Inc., *supra*, el Tribunal de Apelaciones federal, Primer Circuito, expresó que la decisión en el caso de R.C.A. de 1964 fue un pronunciamiento "amorfo" que eludió interpretar cómo aplica en Puerto Rico la cláusula de comercio interestatal de la Constitución federal. Asimismo, el referido foro expresó que parte de la decisión de R.C.A. se fundamentó en el caso de Buscaglia v. Ballester, 162 F.2d 805 (1st Circ. 1947), que fue posteriormente revocado en 1992 en Trailer Marine Transport Corp. V. Rivera, 977 F.2d 1 (1st Circ. 1992).

El Profesor Helfeld, analizando la decisión de este Foro en R.C.A., expresó lo siguiente: "The Supreme Court of Puerto Rico has suggested in a *dictum* that the commerce clause may be inapplicable as a restraint on Commonwealth legislation, but would the Supreme Court of the United States agree? In my judgment the soundest prediction is that it would probably not". Helfeld expresa, además, lo siguiente: "It is essential to keep in mind the distinction between Congress authorizing Puerto Rico to discriminate and Puerto Rico

Concluimos que la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución de Estados Unidos, *supra*, aplica a Puerto Rico. No obstante, **tal aplicación no surge *ex propio vigore* de la Constitución de los Estados Undios, *supra*, la cual no opera de esa forma en nuestra jurisdicción**. **La prohibición de discriminar contra el comercio interestatal aplica a Puerto Rico por voluntad del Congreso de los Estados Unidos, mediante la sección 3 de la Ley de Relaciones Federales, que hace aplicable en nuestra jurisdicción la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución federal**, *supra*.[17] De esta forma se le imprime sentido a la realidad y circunstancias particulares de Puerto Rico, a tenor con la voluntad del Congreso de Estados Unidos de otorgarle el mismo grado de autonomía e independencia, normalmente asociada con los estados de la Unión.

### III

Procede discutir ahora los criterios aplicables para determinar si una legislación estatal viola la cláusula de comercio de la Constitución de los Estados Unidos, *supra*, en su "estado durmiente."

---

discriminating on its own initiative." Helfeld, *supra*, a la pág. 190.

[17] Mediante la sección 3 de la Ley de Relaciones Federales, *supra*, el Congreso Federal, por la vía estatutaria, prohibió que Puerto Rico discriminara contra productos importados de los Estados Unidos.

El Tribunal Supremo federal ha desarrollado una doctrina –*test*– para determinar si un impuesto estatal es válido ante un ataque bajo el "estado durmiente" de la cláusula de comercio interestatal de la Constitución de los Estados Unidos, *supra*.[18] Así, una ley estatal será válida si: 1) existe un nexo sustancial entre la actividad sujeta a la contribución y el estado que la impone; 2) la contribución está distribuida o proporcionada equitativamente; 3) **la contribución en cuestión no discrimina contra el comercio interestatal**; 4) la contribución está relacionada apropiadamente con los servicios provistos por el estado.[19]

Según comenta el profesor Tribe, este análisis responde a unos requisitos del debido proceso de ley que exige que entre el estado impositor y las actividades del contribuyente exista, al menos, una "mínima conexión." De igual manera, Tribe sostiene que el tercer criterio, **que la contribución en cuestión no discrimine contra el comercio interestatal**, es el más importante al momento de determinar la validez de una legislación estatal, *vis a vis* el poder del Congreso federal de regular el comercio entre los estados al amparo de la

---

[18] Este análisis se emplea para determinar si una ley estatal es violatoria de la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución federal.

[19] Wardair Canada, Inc. v. Florida Department of Revenue, 477 U.S. 1 (1986), citado en Iberia v. Srio. de Hacienda, 135 D.P.R. 57 (1993). Conviene resaltar que en el caso de Wardair se particulariza que este *test* aplica en aquellos casos donde se analiza una violación a la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución federal.

cláusula de comercio interestatal de la Constitución federal, *supra*.[20]

Con el beneficio de la discusión que antecede, procedemos a discutir si la Ley Núm. 95, *supra*, en virtud de la cual se impuso una obligación contributiva a los importadores de carne de res, es válida desde una perspectiva constitucional a la luz de la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución de Estados Unidos, *supra*. Veamos.

IV

El esquema establecido en la Ley Núm. 95, *supra*, es violatorio de la cláusula de comercio interestatal en su "estado durmiente." Dicha legislación tuvo el propósito de crear una campaña publicitaria genérica para promover el consumo de la carne de res producida en Puerto Rico. No obstante, la referida publicidad tuvo como meta: **crear conciencia de que existe una alternativa real en la carne de res producida en Puerto Rico; fomentar el consumo de carne de res producida en la isla; crear reconocimiento del nombre; demostrar frescura y calidad del producto local. Asimismo, se realizó una campaña publicitaria en prensa escrita y radio que se dedicó a resaltar los atributos de frescura y calidad**

---

[20] Tribe, *supra*, a la pág 1106. El profesor Tribe fundamente esta contención en dos casos resueltos por el Tribunal Supremo federal; <u>Oregon Waste Sys., Inc. v. Department of Envtl. Quality</u>, 511 U.S. 93 (1994); <u>Chemical Waste Management, Inc. v. Hunt</u>, 504 U.S. 334 (1992). Conviene puntualizar que el *test* empleado en ambos casos se hizo bajo

que contiene la "Carne de Res del País." El elemento de frescura de la carne producida en Puerto Rico fue el criterio más importante de la campaña publicitaria, realizada con los recaudos de un Fondo, establecido por la Ley. Núm. 95, *supra*, **al cual tenían que aportar los importadores de carne de res**. **Todos los anuncios publicados llevaban el eslogan "Carne Fresca del País".**

El propósito central de la campaña genérica **era beneficiar únicamente el consumo de carne de res del país y no la carne importada.** La referida campaña **perjudicaba el mercado de la carne de res importada.**

Siguiendo el tercer criterio del *test* establecido por la jurisprudencia federal, para determinar si un estatuto infringe el "estado durmiente" de la cláusula de comercio interestatal de la Constitución federal, *supra*, resulta forzoso concluir que la Ley Núm. 95, *supra*, en virtud de la cual se le impuso una obligación contributiva a los importadores de carne de res para **fomentar el consumo de carne producida en Puerto Rico, tuvo el efecto de discriminar contra la carne de res importada, a la vez que beneficiaba a la industria local.**

En consecuencia, la obligación contributiva, impuesta en virtud de la Ley Núm. 95, *supra*, **destinada a beneficiar**

---

el análisis de la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución de los Estados Unidos

**únicamente a la carne del país**, **incumple el tercer requisito del *test* esbozado por la jurisprudencia federal.**[21]

Concluimos que la referida ley es inconstitucional por violar la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución de los Estados Unidos, *supra*, aplicable a Puerto Rico.

V

Por los fundamentos antes expuestos, disentimos de la Sentencia dictada por este Tribunal que confirma la Sentencia recurrida, emitida por el Tribunal de Apelaciones. Revocaríamos la misma.

*Efraín E. Rivera Pérez*
*Juez Asociado*

---

[21] El tercer requisito, **que la contribución en cuestión no discrimina contra el comercio interestatal**, se ha analizado de acuerdo al enfoque tradicional que se emplea cuando una legislación estatal es impugnada por alegadamente violar la cláusula de comercio interestatal, en su "estado durmiente", de la Constitución federal. Tribe, *supra*, a la pág. 1106. En consecuencia, una ley estatal que discrimina contra el comercio interestatal, ya sea de su faz o por su aplicación, es virtualmente inválida o inválida *per se.* Philadelphia v. New Jersey, 437 U.S. 617 (1978); Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573 (1986).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estado Libre Asociado de
Puerto Rico y el Secretario
del Departamento de Hacienda

     Recurridos

                                 CC-2005-884

       v.

Supermercados Amigo, Inc.

     Peticionaria

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 8 de marzo de 2007

Este caso planteó un asunto novel en nuestra jurisdicción, a saber: si el derecho a la libertad de expresión en su modalidad de expresión compelida, vicia de nulidad el esquema establecido por la Ley Núm. 95 de 29 de noviembre de 1992, conocida como Ley para Crear la Oficina de la Reglamentación y Promoción de la Industria de la Carne de Res, que imponía una aportación por concepto de importación de carne de res para, entre otras cosas, promocionar la industria de la carne en Puerto Rico. O, si por el contrario, la campaña publicitaria genérica, constituía expresión gubernamental legítima inmune a un ataque bajo la cláusula de libertad de expresión.

Lamentablemente, por estar igualmente dividido este Tribunal se hizo imposible resolver de forma definitiva esta controversia y una sentencia patentemente errónea se convierte en la ley del caso.

I

En septiembre de 2000, el Estado Libre Asociado de Puerto Rico, (el "Estado") a través del Secretario de Hacienda, presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda en cobro de una deuda morosa contraída por Supermercados Amigo, Inc. (el "peticionario" o "Amigo"). En la misma, el Estado solicitó que se le ordenara a Amigo satisfacer la cantidad de ochenta y un mil noventa y ocho dólares con cincuenta y cuatro centavos ($81,098.54), además de las costas, gastos, intereses y honorarios de abogado. La deuda morosa correspondía a una aportación de un centavo por cada libra de carne de res importada a la isla, que imponía la Ley Núm. 95 de 29 de noviembre de 1992, ("Ley Núm. 95"). El dinero recaudado ingresaba en un fondo especial (el "Fondo") creado para el fomento de la industria de la carne. Esta ley estuvo vigente desde el 29 de enero de 1993 hasta el 31 de diciembre de 1996, cuando fue derogada parcialmente por la Ley Núm. 238 de 18 de septiembre de 1996, 5 L.P.R.A. secs. 3051-3061.

Amigo contestó la demanda instada y reconvino. Señaló que la Ley Núm. 95 era inconstitucional toda vez que le obligaba a subsidiar un mensaje a favor de la industria de la carne de res del país en detrimento y contrario a sus propios

intereses como importador de carne de res. Ello así, toda vez que los fondos recolectados se utilizaron para propulsar una campaña genérica a favor de la industria de **la carne de res del país**. Adujo que ello violaba su derecho a la libre expresión además de ser un mecanismo de carácter proteccionista contrario a la cláusula de comercio interestatal de la Constitución de los Estados Unidos. Finalmente indicó que, habida cuenta que la Ley Núm. 238 había derogado la Ley Núm. 95, Amigo no venía obligado a pagar la contribución que impuso esta última.

Eventualmente, Amigo presentó una moción de sentencia sumaria donde se reiteró en los argumentos antes esbozados. Para sostener su posición respecto la utilización del dinero recaudado, éste acompañó su moción con copia del estado de situación del Fondo al 30 de noviembre de 1995, copia de varios anuncios publicados por el Fondo en la prensa del país, el texto de varias pautas radiales, el plan estratégico de la agencia de publicidad del Fondo respecto la campaña a desarrollar, y un informe del Fondo provisto por el Departamento de Hacienda. Petición de *certiorari*, Apéndice, págs. 110-154.

De dichos documentos se colige que para finales de 1995, cuando cesó la vigencia la Ley Núm. 95, el Fondo había cobrado un total de $650,159.04.[22] De esta cantidad, el

---

[22] Del estado de situación del Fondo para el Fomento de la Industria de la Carne de Res que se anejó a la moción de sentencia sumaria, se desprende que el estimado de aportaciones que debían ingresar al Fondo, calculado a partir de la fecha en que entró en vigencia al 30 de noviembre de

Departamento de Hacienda retuvo $65,018.90 en concepto de gastos de administración. Del sobrante, se habían utilizado $103,054.35 en gastos de publicidad y $3,787.41 en servicios profesionales. A esa fecha, las cuentas por pagar eran: $65,018.90 al Departamento de Hacienda, $3,808.76 por servicios profesionales, $130,193.99 en gastos de publicidad y $75.00 en gastos misceláneos. Petición de *certiorari*, Apéndice, págs. 110-111. El costo total de la campaña de publicidad fue de doscientos ochenta mil dólares ($280,000.00).

A base de esta información, Amigo concluyó que la inmensa mayoría de los fondos recobrados se utilizaron para sufragar los gastos de una campaña de publicidad genérica. Sobre ésta, Amigo indicó que la misma iba dirigida a resaltar la industria de la carne de res del país en perjuicio de la carne importada. Para ello acompañó su moción, como indicamos, varios anuncios publicados en la prensa, así como pautas radiales, de los que se desprende que la campaña de promoción iba dirigida a fomentar el consumo de la carne de res del país. Véase discusión *infra*. Los anuncios no identificaban al gobierno del Estado Libre Asociado como el auspiciador de los mismos.

Posteriormente, el Estado presentó su oposición. En su escrito, adujo que eran varios los propósitos que adelantaba la Ley Núm. 95, a saber: reglamentar y promover la industria de carne de res en Puerto Rico, incluyendo la importada;

---

1995, era de $2,631,361.73. De esa cantidad, sólo se había recolectado $650,189.04 al 30 de noviembre.

promover el bienestar general de la industria; y, promover una mejor nutrición para la población. Apuntó además que dicha ley era una legislación de carácter socioeconómico que constituía un ejercicio legislativo válido del poder de reglamentación del Estado. A su vez, señaló que el producto de las aportaciones recaudadas por la Ley Núm. 95, no se había utilizado exclusivamente para una campaña publicitaria genérica como alegaba Amigo. Finalmente indicó, que la Ley Núm. 238 sólo derogó aquellas disposiciones conflictivas con la Ley Núm. 95, por lo que persistía la obligación de pagar la aportación adeudada.

Para refutar la alegación de Amigo sobre el uso brindado a las aportaciones recibidas en virtud de la Ley Núm. 95, el Estado acompañó su escrito con extractos de una deposición que se le tomó al Administrador de la Oficina para la Reglamentación de la Industria de la Carne de Res (el "Administrador") en otro litigio donde se planteaba, según indicó el Estado, idéntica controversia. En ésta, el Administrador testificó que los fondos recibidos se utilizaban para ofrecer orientaciones a consumidores, agricultores e importadores sobre la industria de la carne. Además, que la Oficina para la Reglamentación de la Industria de la Carne de Res en coordinación con el Fondo, proveía inspectores quienes corroboraban que los supermercados, las plantas de elaboración y los almacenes cumplieran a cabalidad con la reglamentación aplicable a esta industria, adelantando así los objetivos de la Ley Núm. 95. Petición de *certiorari*,

Apéndice, págs. 175-181. La moción presentada por el Estado no vino acompañada por copia alguna de los anuncios publicados como parte de la campaña genérica de publicidad de la industria de la carne.

Luego de varios trámites procesales, el Tribunal de Primera Instancia emitió una sentencia rechazando la petición de Amigo. El foro primario concluyó que no era necesario dilucidar los planteamientos de carácter constitucional esgrimidos por Amigo ya que sólo tenía que resolver si procedía o no el cobro de dinero solicitado. Determinó entonces que la derogación parcial de la Ley Núm. 95 no había relevado a Amigo del cumplimiento con la obligación contraída durante la vigencia de ésta, que la deuda existente era líquida y exigible por lo tanto "n[a]da impide que se ordene el cobro de dinero adeudado a todo aquel importador que no cumplió con su obligación durante la vigencia de la Ley 95." Petición de *certiorari*, Apéndice, pág. 249.

Insatisfecho, Amigo acudió ante el Tribunal de Apelaciones. El Estado compareció y anejó a su alegato la deposición completa que le fuera tomada al Administrador. El foro apelativo intermedio emitió una sentencia confirmando el dictamen del foro primario. Concluyó, que la Ley Núm. 95 no era inconstitucional de su faz y que, entre otras cosas, la ley no tuvo como propósito exclusivo propiciar una campaña genérica de publicidad. El foro apelado aparentó haber llegado a esa conclusión a base de las expresiones del Administrador según constan en su deposición. Indicó, que la

Ley Núm. 95 servía un fin legítimo del Estado por lo que constituía expresión gubernamental válida.

Además, señaló que la ley no imponía una carga irrazonable sobre el derecho a la libre expresión de Amigo habida cuenta de que sólo el diez por ciento (10%) de las aportaciones **que debían ingresar al Fondo** habían sido destinadas para la campaña de promoción objetada; y, que la ley no restringía la capacidad de Amigo de llevar a cabo su propia propaganda o promoción. Finalmente, concluyó que la controversia ante el foro primario era una estrictamente de derecho por lo que procedía resolver la misma a través del mecanismo de sentencia sumaria.

En desacuerdo, Supermercados Amigo, Inc., acudió ante este Tribunal mediante solicitud de *certiorari.* En su escrito planteó la comisión de dos errores, a saber:

> (1) Erró el Honorable Tribunal de Apelaciones al no declarar inconstitucional la Ley 95 de 29 de noviembre de 1992 (Ley 95), por crear esta Ley 95 un esquema de expresión compelida que es inconstitucional de su faz y en su aplicación a la parte demandada en vista de que la Ley 95 viola los preceptos de libertad de expresión y de asociación de la parte demandada garantizados por la Constitución del ELA y por la Primera Enmienda de la Constitución de los EEUU.

> (2) Erró el Honorable Tribunal de Apelaciones al permitir que el TPI introdujera y le diera credibilidad a extractos de una deposición (a) tomada por la parte demandante en un caso distinto al de autos; (b) de un individuo que no fue testigo en el caso de autos; (c) que la parte apelante no tuvo la oportunidad de contrainterrogar; y, (d) que está plagada de prueba de referencia múltiple que sería inadmisible aún el caso de autos.

El pasado 26 de enero de 2006 expedimos el auto solicitado. Ambas partes han comparecido. En el día de hoy

se confirma la determinación del Tribunal de Apelaciones por estar igualmente dividido este Tribunal. Disiento de ese curso de acción porque el esquema establecido de la Ley Núm. 95 viola el derecho de la libre expresión de la peticionaria.

**II**

**A**

Nos toca resolver si el esquema establecido en la Ley Núm. 95 violaba el derecho a la libre expresión de la parte peticionaria o si por el contrario, como aduce el Procurador General en su escrito ante este Tribunal, el mismo constituye un ejercicio válido del Estado inmune a un ataque bajo el derecho a la libertad de expresión. Todo ello en el contexto procesal de una petición de sentencia sumaria.

Comenzamos nuestra discusión con una descripción del diseño establecido por la Ley Núm. 95, para luego abordar la controversia de libertad de expresión que se nos ha planteado.

**B**

Como ya apuntamos, la Ley Núm. 95 estableció la Oficina de Reglamentación y Promoción de la Industria de la Carne de Res (la "Oficina"). Del texto de la ley se desprende que la intención de la Asamblea Legislativa al aprobar la ley fue propiciar el desarrollo y fortalecimiento de la industria de la carne de res a través de distintos programas, servicios y actividades. Arts. 4 y 6 de la Ley Núm. 95. Ello, para

beneficio tanto de la ciudadanía como de los productores e importadores de carne de res.[23]

Para subsidiar los programas establecidos y hacer efectivos los objetivos de la ley, ésta creó un Fondo para el Fomento de la Industria de la Carne de Res, que se nutría de las aportaciones por diversos conceptos, impuestas tanto a productores locales como a importadores de carne de res.[24]

---

[23] Los propósitos de la Ley Núm. 95 de 29 de noviembre de 1992, quedaron plasmados en su Exposición de Motivos, que lee como sigue:

Siendo la carne de res alimento básico de alto valor alimenticio en la dieta humana, es nuestro deber dirigir todos los esfuerzos que sean necesarios para lograr el fortalecimiento y desarrollo que requiere esta empresa. Se caracteriza la misma al presente, por una desorganización la cual es visible a diferentes niveles. Reflejo de lo antes indicado es lo siguiente: la carencia de oficinas centralizadas en la cual se pueda tener accesible información sobre precios y condiciones de venta de la carne de res; ausencia de centros de datos sobre diversos aspectos de la industria; falta de orientación y promoción consistente y permanente así como falta de centros de investigación relacionados con la industria de la carne de res.

La permanencia así como la expansión de mercados existentes para la carne de res son de vital importancia para el bienestar de los productores, importadores y otros relacionados con este mercado tan importante para la economía de la Isla. De igual manera es importante que la carne de res sea accesible en un mercado eficiente de manera que podamos asegurar una mejor nutrición a nuestro pueblo.

[24] El Art. 9 de la Ley Núm. 95 de 29 de noviembre de 1992, disponía de las siguientes aportaciones para nutrir el fondo: "(1) Cuatro dólares con catorce centavos ($4.14) por cada animal sacrificado en matadero tomando en consideración como base el peso promedio de un animal sacrificado en matadero. (2) Un centavo ($0.01) por libra de carne de res importada tomando como base el pago hecho para el producto local en consideración al rendimiento del animal sacrificado por el

El Art. 9 de la ley, disponía específicamente que el Fondo sería utilizado "para la promoción de la producción, venta, elaboración y consumo de la carne de res, y toda otra gestión necesaria para el progreso de la industria de la carne de res." Este fondo lo administraba una junta administrativa compuesta por el Administrador, dos representantes de los importadores, tres representantes de los productores, uno de los cuales debía representar a los pequeños agricultores, y un representante del interés público, nombrados todos por el Secretario de Agricultura. Arts. 9 y 10 de la Ley Núm. 95.

La ley disponía que el diez por ciento (10%) de los fondos recaudados se destinaban para solventar los gastos administrativos y operacionales de la Oficina. El remanente de los recaudos se utilizaría para adelantar los objetivos establecidos por ley. Véase, Art. 4 de la Ley Núm. 95. El Secretario de Hacienda estaba facultado para cobrar la aportación provista en la ley.

Como ya apuntamos, la ley estuvo en vigor íntegramente hasta el 1ero de enero de 1997, cuando entró en vigor la Ley Núm. 238, conocida como la "Ley para el Ordenamiento de las Industrias Agropecuarias de Puerto Rico."

La Ley Núm. 238, por su parte, creó un nuevo ordenamiento administrativo para regentar la industria agropecuaria en Puerto Rico. La legislación creó la Oficina de Ordenamiento de las Industrias Agropecuarias de Puerto Rico, adscrita al Departamento de Agricultura. 5 L.P.R.A.

---

producto local. (3) Un dólar ($1.00) por cada ternero sacrificado en el matadero."

sec. 3052. **La ley derogó la disposición de la Ley Núm. 95 que ordenaba la aportación de los importadores de carne de res como a los productores locales de carne de res**.

Esta ley se aprobó "para fortalecer las industrias agropecuarias. [Para que] las empresas que la componen pu[edan] suplir las necesidades de los consumidores puertorriqueños, **por productos de alta calidad producidos localmente**, logrando así un aumento significativo en la contribución de este renglón en nuestra economía." (Énfasis nuestro.) Exposición de Motivos, Ley Núm. 238. De lo anterior se desprende claramente que el propósito de la Ley Núm. 238 fue fortalecer y desarrollar **la industria de la carne de res del país**.

La ley estableció una junta administrativa para cada sector de la industria agropecuaria y cada sector quedó autorizado para establecer un fondo que permitiera promover el desarrollo de la producción y comercialización de sus productos. 5 L.P.R.A. sec. 3056.

En lo que respecta a su interacción con la Ley Núm. 95, la Ley Núm. 238 dispuso que el Secretario de Agricultura estaba facultado para "reestructurar, mediante la reglamentación necesaria, la Oficina para la Reglamentación y Promoción de la Industria de la Carne de Res y la Junta del Fondo para el Fomento de la Industria de la Carne de Res. Esta última una vez reestructurada pasará a ser la Junta Administrativa de esta industria agrícola, preservando así la continuidad de sus operaciones." Art. 13 de la Ley Núm. 238,

5 L.P.R.A. sec. 3062. El Art. 12 de la ley, 5 L.P.R.A. sec. 3061, proveyó expresamente para la transferencia y continuidad de las funciones de la Oficina para la Reglamentación y Promoción de la Carne de Res, quedando adscrita a la Oficina de Ordenamiento de las Industrias Agropecuarias creada en virtud de la nueva ley.

De lo anterior se colige que la Ley Núm. 238 pretendió crear un nuevo esquema administrativo para incentivar la industria agropecuaria del país aunque dispuso para que los programas y los fondos creados por la anterior Ley Núm. 95 se transfirieran a la nueva estructura administrativa establecida bajo la primera. Más que nada, la Ley Núm. 238 centró su foco de atención en el crecimiento y desarrollo de la industria agropecuaria del país.

**III**

**A**

El derecho a la libre expresión consagrado en el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico, es uno de los valores más preciados que resguarda la Constitución y cobija "la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de los derechos." 4 *Diario de Sesiones de la Convención Constituyente* 2564 (1961). Es piedra angular que sostiene nuestro sistema democrático. Facilita "el desarrollo pleno del individuo y estimula el libre intercambio y la diversidad de ideas, elementos vitales del

proceso democrático." *Velázquez Pagán v. AMA,* 131 D.P.R. 568, 576 (1992). En su esencia, la libertad de expresión se levanta como barrera de difícil rebaso para aquella acción del Estado que pretenda asfixiar la expresión del ciudadano.

De la misma forma que este axioma prohíbe que el Estado sofoque la expresión ciudadana, así también le impide que obligue al ciudadano a exponer, manifestar o adoptar credos con los que se está en desacuerdo.[25] En *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) se resolvió que el gobierno no podía obligar a estudiantes de la escuela pública a saludar la bandera y recitar el juramento de fidelidad a los Estados Unidos, por ser ello contrario a la Primera y Decimocuarta Enmienda de la Constitución. Al así hacerlo apuntó el Tribunal: "If there is a fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." 319 U.S. pág. 642. *Barnette* estableció el estándar contra el cual se iban a medir las controversias sobre expresión compelida.

Más tarde, en *Wooley v. Maynard*, 430 U.S. 705 (1977), el Tribunal se enfrentó nuevamente a un planteamiento de expresión compelida. Al hacerlo, declaró inconstitucional por ofender la Primera Enmienda, una ley del estado de New Hampshire que tipificaba como delito mutilar el eslogan del estado, "Live Free or Die", que aparecía en las tablillas de

---

[25] Esto se denomina en la doctrina norteamericana como expresión compelida ("compelled speech").

los automóviles.    Al comparar *Wooley* con *Barnette*, el Tribunal expresó:    "Compelling the affirmative act of flag salute involved a more serious infringement upon personal liberties that the passive act of carrying the state motto on a license plate, but the difference is essentially one of degree."   430 U.S. pág. 715.

Posteriormente, el principio establecido en *Barnette* fue extendido a controversias que involucraban aportaciones obligatorias de miembros disidentes de foros integrados. Esto es lo que se conoce como la doctrina de subsidio compelido ("compelled subsidy"), una sub-categoría de la doctrina de expresión compelida.    El concepto de subsidio compelido entraña un esquema mediante el cual el Estado le requiere al ciudadano que subsidie con su aportación económica un mensaje con el cual está en desacuerdo.[26]

En *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), el Tribunal Supremo de los Estados Unidos discutió, por primera vez, la doctrina de subsidio compelido.    En *Abood*, un grupo de maestros del sistema de instrucción pública de Detroit objetó que, en virtud de la cláusula de taller agencial ("agency shop") del convenio colectivo, éstos venían obligados --no siendo miembros de la unión-- a pagar una cuota especial a ésta a manera de reembolso por las gestiones efectuadas por la unión como agente negociador de

---

[26] *Johanns v. Livestock Marketing Assoc.*, 544 U.S. 550, 557 (2005)("[In] 'compelled subsidy' cases . . . an individual is required by the government to subsidize a message he disagrees with . . . .")

la colectividad. La objeción de los maestros se basó en que se oponían a la negociación colectiva en el sector gubernamental así como también al uso que la unión le daba a los fondos de la unión. Los maestros sostenían que este diseño violaba su derecho a la libre expresión, pues le obligaba a subsidiar causas y mensajes políticos e ideológicos auspiciados por la unión con los que no estaban de acuerdo.

El Tribunal Supremo resolvió que la cláusula del convenio colectivo que les obligaba a hacer las aportaciones compulsorias a la unión era válida, toda vez que existía un interés de vital importancia para el Estado en propiciar la negociación colectiva. Ahora bien, dispuso que los maestros no podían ser obligados, por mandato de la Primera Enmienda, a sufragar con sus cuotas actividades políticas o ideológicas que no compartían, ya que el mensaje objetado no era pertinente al proceso de negociación colectiva. Específicamente sostuvo el Tribunal:

> We do not hold that a union can not constitutionally spend funds for the expressions of political views, on behalf of political candidates, or towards the advancement of other ideological causes **not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of government employment**. (Énfasis nuestro.)

*Abood,* 431 U.S. pág. 235-236.

Al así resolver, *Abood* estableció lo que se conoce como el estándar de pertinencia ("germaneness test") para

determinar cuándo un mensaje puede ser subvencionado por una aportación compelida sin ofender la Primera Enmienda. *Abood* ejemplifica el paradigma que postula que la libertad de contribuir a causas políticas entraña la libertad de no contribuir. Bajo *Abood*, un esquema de subsidio compelido que haya sido objetado sólo será válido si: (1) se determina que el mensaje es pertinente a los propósitos y objetivos del grupo; y, (2) que el mensaje difundido no es político o ideológico.

Posteriormente, en *Keller v. State Bar of California*, 496 U.S. 1, 14-16 (1990), el Tribunal abundó sobre el estándar de pertinencia aludido al invalidar un programa de cuotas mandatorias porque se utilizaban para financiar expresiones de índole políticas o ideológicas, ajenas a los objetivos de la colegiación compulsoria en el estado de California. *Keller*, 496 U.S. pág. 14. ("[T]he funding standard must be whether the challenged expenditures are necessary or reasonably incurred for the purpose of regulating the legal profession.")

En *Colegio de Abogados v. Schneider*, 112 D.P.R. 540, 554 (1982), adoptamos el análisis de *Abood* y resolvimos que aun cuando la colegiación compulsoria era válida constitucionalmente, el Colegio de Abogados no podía utilizar las cuotas --o parte de ellas--, para subsidiar alguna expresión o actividad del Colegio de Abogados con la cual un colegiado no estuviese de acuerdo. Concluimos que el derecho a la libertad de expresión contenido en la Constitución de

Puerto Rico protegía el derecho de los disidentes a no subvencionar con sus cuotas una expresión ideológica que estimaban objetable.

Con posterioridad a *Schneider*, no habíamos tenido oportunidad, hasta ahora, para delinear los contornos de nuestra normativa respecto el derecho a la libre expresión en el contexto de subsidio compelido. En vista de ello, parece apropiado que repasemos a manera de ilustración, la trayectoria subsiguiente de *Abood* expuesta por el Tribunal Supremo de los Estados Unidos.

**B**

Los principios establecidos en *Abood* y *Keller*, han sido posteriormente aplicados por el Tribunal Supremo --con resultados disímiles-- a situaciones que implicaban aportaciones económicas obligatorias ("checkoffs") promulgadas mediante reglamentación agrícola, para financiar campañas publicitarias genéricas. *E.g.*, *U.S. v. United Foods, Inc.*, 533 U.S. 405 (2001) y *Glickman v. Wileman Brothers*, 521 U.S. 457 (1997).[27] Véase además, Buchman Buckles, Food Fights in the Courts: The Odd Combination of Agricultural and First Amendment Rights, 43 *Hous. L. Rev.* 415, 416 (2006)("The compelled subsidy doctrine had been largely unexplored until its recent collision with

---

[27] Cabe señalar que por campaña publicitaria genérica se entiende aquella campaña diseñada a estimular el consumo de un producto agrícola en un mercado. *Glickman v. Wileman Brothers*, 521 U.S. 457, 476 (1997)("Generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market. That purpose is legitimate and consistent with the regulatory goals of the overall statutory scheme.")

agriculture.")   En vista de la importancia que revisten *Glickman* y *United Foods* a la controversia que hoy se nos plantea, analicemos los mismos con detenimiento.

En *Glickman*, el Tribunal Supremo rechazó una impugnación bajo la Primera Enmienda de la Constitución de los Estados Unidos de un programa establecido en virtud del "Agricultural Marketing Agreement Act of 1937", ("AMAA") 7 U.S.C. secs. 601 *et seq.*, que requería, entre otras cosas, que agricultores que cosechaban árboles frutales en California financiaran una campaña genérica de publicidad para fomentar su consumo.[28] Esta campaña formaba parte de un amplio entramado legislativo federal cuyo propósito era controlar el mercado colectivizado de productos agrícolas, en este caso melocotones y ciruelas, ("agricultural commodities"), específicamente respecto la producción y venta del producto, eliminando la libre competencia.   En vista de lo cual, el radio de acción disponible a los agricultores en este mercado había sido restringido ya por el gobierno federal.  Ante esta realidad, el Tribunal definió la controversia ante su consideración bajo los siguientes términos:  "The legal question that we address is whether being compelled to fund this advertising raises a First Amendment issue for us to resolve, or rather is simply a question of economic policy for Congress and the Executive to resolve."  521 U.S. pág. 468.

---

[28] El "Agricultural Marketing Agreement Act of 1937", 7 U.S.C. secs. 601 *et seq*, fue uno de los programas legislados por el Congreso de los Estados Unidos como parte del programa del Nuevo Trato del Presidente Roosevelt.

El Tribunal rechazó que *Abood* requiriese que se declarara inválida la campaña publicitaria genérica impugnada, por cuanto no se trataba de expresión de carácter político o ideológico como el implicado en *Abood*.[29]   En específico, el Tribunal indicó lo siguiente:

> *Abood*, and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, **Abood merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's 'freedom of belief.'**   (Énfasis nuestro.)

*Glickman*, 521 U.S. pág. 471.[30]  Por otro lado, dispuso que la campaña publicitaria objetada era meramente un componente más de lo que era una abarcadora legislación relacionada con un mercado colectivizado altamente regulado, además de que la campaña era claramente pertinente ("unquestionably germane") al esquema reglamentario.  521 U.S. pág. 473.  Sobre esto se indicó:

> **The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme.**   It

---

[29]  Ciertamente, el derecho a la libre expresión que se reconoce en la Constitución del Estado Libre Asociado tiene un contenido más amplio que lo expresado por el Tribunal en *Glickman* con su restrictiva interpretación del contenido y alcance de *Abood*.  *E.g., Roth v. United States*, 354 U.S. 476, 484 (1957)("All ideas having even the slightest redeeming social importance . . . have the full protection [of the First Amendment].")

[30]  Este razonamiento fue vehementemente rechazado en la opinión disidente así como por tratadistas que han abordado el tema.  Véase, R. Solla, *Smolla and Nimmer on Freedom of Speech*, Thomson-West, vol 2, sup. 2006, sec. 20:45, pág. 20-156.("The Court seemed to analyze the case with blinders on, seeing it as posing only questions of agricultural policy, not control of expression.")

> is in this context that we consider whether we should review the assessments used to fund collective advertising, together with other collective activities, **under the standard appropriate for the review of economic regulation or under the heightened standard appropriate for the review of First Amendment issues**. (Énfasis nuestro.)

*Glickman*, 521 U.S. pág. 468.

*Glickman* analizó la controversia planteada desde la perspectiva de que se trataba de una legislación de carácter económico que regulaba intensa y ampliamente el mercado al punto de restringir el libre comercio, proveyendo estabilidad al mercado, y no desde la óptica de la Primera Enmienda y de la obligación impuesta por ley sobre el locutor, quien teniendo objeciones definidas al mensaje estaba obligado a subvencionarlo. Como resultado del anterior análisis se sostuvo la validez del programa impugnado. Véase, R. Solla, *Smolla and Nimmer on Freedom of Speech*, Thomson-West, vol 2, sup. 2006, sec. 20:45.

Por otro lado, en *United Foods, ante*, en un caso con un andamiaje similar al de *Glickman,* el Tribunal Supremo llegó a la conclusión opuesta. El programa impugnado en *United Foods* se estableció a tenor con la ley federal conocida como "Mushroom Promotion, Research and Consumer Information Act", 7 U.S.C. sec. 6101 *et seq*. Bajo esta ley, el Secretario de Agricultura estaba autorizado a crear un consejo asesor para adelantar los objetivos del estatuto federal. Como parte de ello se proveyó para la imposición de una contribución obligatoria a los productores de zetas con el propósito de promover esta industria, promover la investigación y, proveer

información al consumidor así como a distintos sectores de la industria.   7 U.S.C. sec. 6104(g)(2).   La mayoría de los fondos recolectados se utilizaron para una campaña genérica de publicidad encaminada a promover la venta de zetas.

El Tribunal concluyó, a base del récord ante sí, que el único programa financiado por las contribuciones era la campaña publicitaria, es decir, la expresión misma.   Se determinó entonces, aplicando a *Abood* y *Keller*, que el programa allí impugnado ofendía la Primera Enmienda.   "The only program the Government contends the compelled contributions serve is the very advertising scheme in question."   533 U.S. pág. 415.

Se precisó que la diferencia fundamental entre el programa rechazado en *United Foods* y el declarado válido en *Glickman,* era que el establecido en este último formaba parte de un esquema de reglamentación amplio del mercado, en el cual la campaña publicitaria era meramente una parte incidental.   Por el contrario, en *United Foods* no existía tal esquema de regulación sino todo lo contrario, pues regía un mercado de libre competencia.   *United Foods*, 533 U.S. pág. 411.   En específico el Tribunal indicó lo siguiente:

> In contrast to the program upheld in *Glickman*, where the Government argued the compelled contributions for advertising were 'part of a far broader regulatory system that does not principally concern speech,'. . . there is no broader regulatory system in place here.   We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself. [. . .] The cooperative marketing structure relied upon by a majority of the Court in *Glickman* to sustain an ancillary assessment finds no corollary here; **the expression respondent is**

**required to support is not germane to a purpose related to an association independent from the speech itself;** and the rationale of *Abood* extended to the party who objects to the compelled support for this speech. (Énfasis nuestro)

533 U.S. págs. 415-516.[31]

Es importante destacar, que al aplicar *Abood*, el Tribunal expandió la protección que ofrece la Primera Enmienda al resolver que la expresión objetada no tenía que ser de carácter política o ideológica para estar protegida, como se había dispuesto en *Glickman*.[32] Por lo tanto, la única pregunta que había que hacerse era si la aportación económica compelida era pertinente para adelantar el fin legítimo del Estado en el programa legislado. La pregunta se contestó en la negativa al determinarse que el único propósito de la aportación resultaba ser la expresión misma.

Finalmente, hay que puntualizar que en la opinión el Tribunal intimó que el mismo esquema podría resistir un ataque bajo la Primera Enmienda si la campaña publicitaria

---

[31] Véase, Dindinger, Free Speech for Mushrooms but not Peaches: Economic Regulations after United Foods, Inc, 31 *Colo. Law* 61, 63 (2002).

[32] En *United States v. United Foods, Inc.*, 533 U.S. 405, 413 (2001) el Tribunal Supremo indicó:

We did say in *Glickman* that *Abood* 'recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflicts with one's 'freedom of belief'. . .**We take further instruction, however, from *Abood*'s statement that speech need not be characterized as political before it receives First Amendment protection.** A proper application of *Abood* requires us to invalidate the instant statutory scheme." (Énfasis nuestro.) (Citas omitidas.)

pudiese ser catalogada como expresión gubernamental.[33] *United Foods*, 533 U.S. págs. 416–417. Un año más tarde, esa controversia llegó al Tribunal en *Johanns, v. Livestock Marketing Assn., ante.*

## IV

En *Johanns, ante*, se cuestionaba también un programa de subsidio compelido muy similar al declarado inválido en *United Foods*, en esta ocasión el producto agrícola era la carne de res. El Tribunal validó la aportación compelida al concluir que la campaña publicitaria objetada constituía expresión gubernamental legítima no sujeta a las limitaciones de la Primera Enmienda.[34] El Tribunal sostuvo que el mensaje promocional en ese caso estaba controlado férreamente en todas sus etapas por el gobierno federal. "The message set out in the beef promotions is from beginning to end the

---

[33] El Tribunal Supremo no tuvo que enfrentarse a un planteamiento de esta naturaleza en *United Foods, ante*, porque el asunto no fue expuesto ante los foros inferiores y por lo tanto, el Tribunal rehusó entrar a evaluar el mismo cuando el gobierno federal lo planteó por primera vez ante el Tribunal Supremo.

[34] Para muchos, la trilogía de *Glickman*, *United Foods* y *Johanns*, ejemplifica el estado de fluidez de la doctrina de expresión gubernamental y la ausencia de un andamiaje conceptual claro y preciso que permita aplicar la misma en casos que involucran una contribución compelida. *E.g.,* Champoux, Uncovering Coherent in Compelled Subsidy of Speech doctrine: *Johanns v. Livestoxck Marketing Ass'n*, 125 S.Ct. 2055 (2005), 29 *Harv. J.L. & Pub. Pol'y* 1107, 1112 (2005)("the Court´s decision in three mandatory checkoff cases over eight years seem more schizophrenic that schematic."); Comment, Government Speech Doctrine, Compelled Support for Agricultural Advertising, 119 *Harv. L. Rev.* 277, 283 (2005)("In the wake of *Johanns*, it is clear that government speech doctrine can trump other First Amendment concerns."); Troy, Do we have a Beef with the Court? Compelled Commercial Speech Upheld, But it Could Have Been Worse, 2005 *Cato Sup. Ct. Rev.* 125.

message established by the Federal Government." 544 U.S.
pág. 560. Siendo entonces expresión gubernamental, el
gobierno podía solicitar la asistencia de fuentes no
gubernamentales para costear el programa, como eran los
productores de carne. Sobre este particular se indicó en la
opinión:

> When, as here, the government sets the overall
> message to be communicated and approves every word
> that is disseminated, it is not precluded from
> relying on the government-speech doctrine merely
> because it solicits assistance from nongovernmental
> sources in developing specific messages.

El Tribunal sostuvo también que el hecho que los fondos
procedieran de una aportación específica o dirigida a un
grupo en particular y no de un impuesto general no variaba el
resultado. A esos efectos, indicó el Tribunal: "The
compelled-subsidy analysis is altogether unaffected by
whether the funds for promotions are raised by general taxes
or through targeted assessment. Citizens may challenge
compelled support of private speech, but have no First
Amendment right not to fund government speech." 544 U.S.
pág. 562.

Como resultado de lo anterior, el Tribunal concluyó que
cuando se trate de expresión gubernamental legítima, la
impugnación de su faz del mecanismo de susidio compelido
establecido, como ocurrió en *Johanns*, es improcedente como
cuestión de derecho. El Tribunal rehusó extender su
pronunciamiento a situaciones que involucrasen una
impugnación, en su aplicación, de un esquema de subsidio
compelido.

La casuística que hasta aquí hemos reseñado pone de manifiesto cómo el Tribunal Supremo de los Estados Unidos ha atendido el tema del subsidio compelido y su interrelación con el derecho a la libre expresión consagrado en la Primera Enmienda de la Constitución federal. Nos corresponde a nosotros evaluar, con independencia de dicha jurisprudencia, una controversia idéntica bajo el crisol de la Constitución del Estado Libre Asociado.

## V

## A

Apuntamos inicialmente que el peticionario argüía que el programa establecido mediante la Ley Núm. 95 era inconstitucional tanto de su faz como en su aplicación, por violar su derecho a la libertad de expresión al obligarlo a contribuir económicamente a una campaña de publicidad encaminada a promocionar la carne de res del país, en perjuicio de sus intereses económicos como importador de carne. El Estado por su parte, refutó tal planteamiento a base de dos argumentos principales. Primero, que se trataba de expresión gubernamental no sujeta a los rigores del derecho a la libertad de expresión. Segundo, que la aportación impugnada se utilizaba para subvencionar un mensaje genérico válido que formaba parte del amplio esquema reglamentario que regula la industria de la carne de res.

## B

Atendemos primeramente el argumento del Estado de que el mensaje objetado es expresión gubernamental, pues de

asistirle la razón ahí concluiría nuestra revisión de esta controversia. Ciertamente, ésta es la pregunta medular en este caso.

Iniciamos señalando que éste es un tema que no habíamos abordado previamente; aunque sí habíamos expresado que el gobierno está facultado y tiene el deber de informar a la ciudadanía sobre asuntos de vital interés a ésta, propios a la gestión gubernamental. A modo de ejemplo, no cabe cuestionar la validez de un programa gubernamental encaminado a informar y orientar al país sobre cómo afrontar un desastre natural o una epidemia.

En *PPD v. Gobernador*, I, 139 D.P.R. 643, 680 (1995) indicamos lo siguiente: "Hemos reconocido que la expresión del Gobierno de naturaleza educativa e informativa es indispensable **para que el pueblo pueda juzgar su labor y exigir remedios a los agravios gubernamentales.**" (Énfasis nuestro.) Como vemos, al reconocer la facultad del gobierno de expresarse lo hicimos en función de que de esta forma se propiciaba la labor fiscalizadora del ciudadano sobre la gestión misma del gobierno. *PPD v. Gobernador, I, ante*; *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 381 (1984). Hemos sido en extremo celosos al evaluar controversias relacionadas con el derecho del gobierno a exponer un mensaje al punto de rechazar, sin ambages, reclamos de éste de que le asiste un derecho constitucional a expresarse para informar al ciudadano sobre su gestión. *PPD v. Gobernador II,* 136 D.P.R. 916, 923 (1994)("el Gobierno no

tiene un derecho constitucional a la libre expresión protegido.") Véase también, *PPD v. Gobernador, I, ante*. Es por lo tanto en este contexto y con este trasfondo que debemos encarar la interrogante que se ha planteado sobre si estamos concretamente frente a una expresión gubernamental.[35]

## C

La doctrina de expresión gubernamental tiene que partir de la premisa que es una realidad indiscutible que para gobernar hay que comunicar. Hay que informarle a la ciudadanía todo aquello que resulte indispensable y pertinente a la gestión misma de gobierno. El gobierno tiene entonces que, necesariamente, acudir y participar en el "mercado de las ideas".[36] Otro de sus supuestos tiene que ser el reconocimiento que el proceso político constituye el detente más importante a los excesos del gobierno. Éste, el proceso político, se convierte entonces en el garante del

---

[35] Debemos puntualizar aquí que la doctrina de expresión gubernamental es de reciente creación en Estados Unidos donde ha generado una enorme controversia. Su desarrollo por lo tanto se encuentra en etapa incipiente por lo que los contornos de la doctrina no han sido delineados con total precisión. Sobre este tema véase, entre otros: Wyatt, The Curious Relationship Between the Compelled Speech and Government Speech Doctrines, 117 *Harv. L. Rev.* 2411, 2427 (2004)("[Government speech is] the ugly stepchild of First Amendment doctrine."); Buchanan Buckles, *supra*, pág. 446("Rather than any one solid principle, a conglomeration of disparate rulings have been patched together to form a doctrine of sorts."); Bezanson, Buss, The Many Faces of Government Speech, 86 *Iowa L. Rev.* 1377, 1381 (2001)("[The Supreme Court has built] an edifice now so riven with incoherence and fine distinctions that it is on the verge of collapse.")

[36] *Cf., Abrams v. United States*, 250 U.S. 616, 630 (1919)("[T]he ultimate good desired is better reached by free trade in ideas −th[e] . . . best test of truth is the power of the thought to get itself accepted in the competition of the market. . . .")

derecho a libre expresión de quienes objetan un mensaje compelido.[37]

**Por ello somos del criterio que para que el proceso político pueda surtir efecto y el ciudadano pueda fiscalizar eficazmente al gobierno en este contexto, es indispensable que el ciudadano pueda identificar la expresión objetada como una proveniente del Estado.** Salvo que sea evidente que el mensaje putativo gubernamental proviene efectivamente del gobierno, la proveniencia gubernamental no puede justificar la carga sobre el derecho a la libre expresión que supone un mensaje compelido. Tiene que ser así pues la premisa es sencilla, sin conocimiento de los hechos, "no se puede juzgar; tampoco se pueden exigir remedios a los agravios gubernamentales . . . a través del proceso de las urnas cada cuatro (4) años." *Soto v. Srio. de Justicia*, 112 D.P.R. 477, 485 (1982). Véase también, *Santiago v. Bobb y El Mundo*, 117 D.P.R. 153, 159 (1986). Recordemos lo que ya hemos resuelto, la expresión gubernamental se da en función del derecho del ciudadano a fiscalizar la gestión gubernamental. *PPD v. Gobernador, I, ante*

En este caso, el mensaje objetado no aparecía identificado como un mensaje del gobierno. Conforme se desprende de los anuncios en prensa, cuyas copias obran en autos, lo único que identificaba al locutor era, en dos de

---

[37] Sobre este particular se indicó en *Johanns, ante*, (Souter, J., op. disidente): "Democracy ensures that government is not untouchable when its speech rubs against the First Amendment interest of those who object to supporting it; if enough voters disagree with what government says, the next election will cancel the message."

ellos, el logo del Fondo del Fomento de la Carne de Res y el eslogan "Carne Fresca del País."[38] En los otros anuncios de prensa la única atribución que aparece en los mismos es solamente el eslogan "Carne Fresca del País", sin más. Este mismo eslogan aparece en pegatinas y camisetas. De otra parte, del texto de los anuncios que se difundieron en la radio, no surge que se identificara al gobierno como el locutor. Véase, Petición de *certiorari*, Apéndice págs. 112-152. Bajo ninguno de estos supuestos, como se puede apreciar, el ciudadano podía identificar al Estado como el comunicador. **El Estado no nos ha indicado que se publicaran otros anuncios donde se identificara al Estado como el emisor; y de ninguna manera ha refutado la aseveración del peticionario sobre este particular.** Siendo ello así, no podemos brindarle al mensaje difundido el manto de protección que le cobijaría bajo la doctrina de expresión gubernamental. No tiene razón el Estado en su planteamiento.

**D**

El segundo señalamiento del Estado es que la campaña objetada era válida toda vez que, al igual que ocurría en *Glickman*, en este caso nos enfrentamos a una industria altamente regulada. Señaló el Procurador General: "Un examen de la legislación y reglamentación aplicable a la

---

[38] La plataforma estratégica diseñada por la compañía publicitaria contratada por el Fondo, señalaba que en estos anuncios aparecería el logo del Departamento de Agricultura, Fondo del Fomento de la Industria de la Carne de Res y el eslogan de Carne de Res del País. Como indicamos, en la copia de los anuncios que se anejaron a la moción de sentencia sumaria no aparece el logo del Departamento y sólo del Fondo.

industria de la carne de res demuestra que éste es un producto altamente regulado, tanto en la actividad de exportación, como de importación." Alegato del Procurador General, pág. 29. A modo de ejemplo, el Estado enumeró los requisitos federales impuestos al mercado de la carne, con los cuales el gobierno del Estado Libre Asociado tiene que cumplir. *E.g.*, inspección y examen de la carne (21 U.S.C. secs. 603, 606, 608, 609); disposición de excedente o desechos (21 U.S.C. secs. 604, 605); etiqueta y empaque (21 U.S.C. sec. 607); almacenaje (21 U.S.C. sec. 624).

Lo cierto es que soy del criterio que no debemos descartar la posibilidad de que proceda incorporar la norma de *Glickman* a nuestra Constitución. Cuando el esquema reglamentario sea tan extensivo como el que allí se evaluó, podría entenderse que el carácter gubernamental de la expresión compelida ha de ser evidente para los ciudadanos. Ahora bien, podemos evaluar el planteamiento del Estado sin resolver hasta qué punto (si alguno) la doctrina *Glickman* debe incorporarse a nuestra Constitución.

El problema con el argumento del Estado es que confunde el contenido del concepto de "regulación del mercado" esbozado en *Glickman*. *Glickman* se refiere a aquella reglamentación que rige en un mercado colectivizado, dirigida a controlar los precios en el mercado desplazando la libre competencia. Recordemos que el "Agricultural Marketing Agreement Act" de 1937, analizado en el caso, es una

legislación aprobada como parte del Nuevo Trato. Sobre el

AMMA, *Glickman* indica lo siguiente, citamos *in extenso*:

> Congress enacted the Agricultural Marketing Agreement Act of 1937 (AMMA), . . ., **in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities**. . . . Marketing orders promulgated pursuant to the AMAA are **a species of economic regulation that has displaced competition in a number of discrete markets; they are expressly exempted from the antitrust laws. . . Collective action, rather than the aggregate consequences of independent competitive choices, characterizes these regulated markets.** In order **'to avoid unreasonable fluctuations in supplies and prices,'** . . . **these orders may include mechanisms that provide a uniform price to all producers in a particular market,** that limit the quality and the quantity of the commodity that may be marketed, . . . determine the grade and size of the commodity, . . . and that make an orderly disposition of any surplus that might depress market prices. (Énfasis nuestro.) (Citas omitidas.)

*Glickman*, 521 U.S. pág. 461. Es por ello que el Tribunal

evaluó la controversia desde la perspectiva que analizaba una

legislación de carácter económico aprobada por el Congreso,

que le merecía gran deferencia. "In sum, what we are

reviewing is a species of economic regulation that should

enjoy the same strong presumption of validity that we accord

to other policy judgments made by Congress." 521 U.S. pág.

477. Es importante puntualizar, que la reglamentación en

*Glickman* estaba exenta de las leyes de monopolios pues, en

efecto, lo que hacía era controlar férreamente el mercado de

la demanda para así controlar los precios.

En este caso el Estado no ha planteado que la Ley Núm.

95 y su reglamentación, tuviese como objetivo regular el

mercado de la carne en el país para controlar así su precio.

Por el contrario, el mercado de la carne de res en Puerto Rico --contrario a lo que sucede con nuestra industria lechera o la del café--, no impone precios uniformes, no impone cuotas respecto a la cantidad que se produce y mercadea, no admite restricciones en cuanto a calidad y, no impone un procedimiento sobre cómo se utilizarán las ganancias obtenidas. Véase Alegato de la parte peticionaria, págs. 22-23. Además, éste no es un mercado que se ha colectivizado o que se eximió de las leyes monopolísticas, como tampoco ha sido subsidiado por el gobierno mediante apoyo en cuanto a precios. En conclusión, contrario a lo que ocurría en *Glickman*, el mercado de carne de res en Puerto Rico es uno donde rige la libre competencia.

*Glickman* por lo tanto, no está disponible para validar el esquema de subsidio compelido establecido por la Ley Núm. 95.

**E**

Debemos preguntarnos entonces si bajo la Constitución del Estado Libre Asociado, la utilización que se le ha dado a las aportaciones establecidas bajo la Ley Núm. 95, infringe el derecho a la libre expresión de la parte peticionaria. Somos del criterio que, a la luz de los hechos en este caso, la respuesta es en la afirmativa.

Los fondos provenientes de las aportaciones que nutrían el Fondo para el Fomento de la Carne de Res se debían utilizar entre otras cosas, para, diseñar una campaña publicitaria genérica a favor del consumo de la carne en

Puerto Rico. Ahora bien, ello no ocurrió así. Los objetivos de esta campaña, según diseñados por la agencia que desarrolló la misma, fueron los siguientes: "(1) **Crear conciencia de que existe una alternativa real en la carne de res de PR. (2) Fomentar el consumo de carne de res de PR.** (3) Crear reconocimiento del nombre. (4) **Demostrar frescura** y calidad del producto." (Énfasis nuestro.) Véase, Petición de *certiorari*, Apéndice pág. 120. Parece evidente que el propósito de la campaña diseñada era, efectivamente, resaltar y así promover el consumo de la carne de res del país.

De hecho, el comunicado de prensa difundido informando sobre el lanzamiento de la campaña publicitaria indicaba lo siguiente: "La Industria de la Carne de Res **del País** comenzó una nueva campaña de publicidad para **promover su consumo en Puerto Rico.** [La campaña] consta de anuncios de prensa y radio que resaltan los **atributos de frescura** y calidad **que contiene la Carne de Res del País . . .** [E]l concepto de frescura [se estableció] como elemento principal de la campaña." Petición de *certiorari*, Apéndice, pág. 162. Lo primero que llama la atención del referido comunicado de prensa es que se informa que el auspiciador de la campaña es la industria de la carne de res **del país.** Luego resulta evidente que el enfoque de la campaña es precisamente resaltar esta industria. Así se desprende de los anuncios publicados. Veamos algunos ejemplos.

Los anuncios que constan en autos. Veamos algunos ejemplos:

Uno de los anuncios en cuestión, publicado a página completa en uno de los diarios del país, leía como sigue:

Cuando se tiene un buen producto hay que resaltar todos sus méritos. Frescura, Sabor, Calidad.

**La Carne de Res del País** es carne Magra, limpia, baja en grasa y con los minerales necesarios para el desarrollo. Además contiene proteínas, hierro y vitaminas . . .

Nuestro compromiso con Puerto Rico va más allá de cumplir con una labor. Queremos darle lo mejor de nuestra tierra. Pro eso cada empaque de carne de res lleva una etiqueta. **Busca que sea del País.** Estamos tan seguro de la calidad de nuestro producto que **indicamos en la etiqueta que es de aquí**. (Énfasis nuestro.)

Otro de los anuncios objetados incluía la siguiente exhortación al ciudadano: "cuando compre carne de res . . . pídala con todo. **Con todo el cuidado y esfuerzo con que se crían las reses en Puerto Rico . . .** con todo el amor que se le dedica al trabajo . . . además de todo el sabor, la **frescura**, la calidad y los componentes nutricionales que **tiene la Carne de Res del País.**" (Énfasis nuestro.)

De otra parte, todos los anuncios que se publicaron llevaban estampado el eslogan "Carne Fresca del País." Expresión que entraña un mensaje subliminal de que lo fresco, que es lo producido localmente, es superior a lo importado. Ya vimos como el concepto "frescura" se incorporó expresamente a esta campaña. Aun cuando uno de los propósitos del Fondo creado en virtud de la Ley Núm. 95, era promocionar la industria de la carne de res en Puerto Rico, según el plan diseñado, aprobado e implementado, **la campaña genérica desarrollada sólo beneficiaba la industria de carne**

**de res del país y no la carne importada.** Por el contrario, la campaña perjudicaba el mercado de la carne de res importada. Se le requería a la parte peticionaria financiar una campaña de publicidad que sólo beneficiaba a su competencia. Para contrarrestar el posible efecto negativo del mensaje genérico, Amigo vendría obligado a desarrollar una "contra campaña" resaltando los beneficios de la carne de res importada. No se ha aducido razón alguna que permita validar la carga impuesta sobre el derecho a la libre expresión de la parte objetante al mensaje compelido.[39]

En este caso nos enfrentamos a una campaña publicitaria genérica a favor del consumo de un producto en perjuicio de otro. Campaña, subvencionada por aportaciones obligatorias del ente "perjudicado" por el contenido mismo de la campaña.[40] El gobierno no puede con su acción --sin ofender el derecho a la libre expresión--, inclinar la balanza a favor de un sector de una industria en perjuicio del competidor, de la forma y manera que ha ocurrido en este caso. Los valores que representan el derecho a la libertad

---

[39] No nos expresamos por lo tanto, sobre que diferencia, si alguna, pudiera tener sobre el resultado, el que la campaña estuviese dirigida a evitar una situación grave de salud pública, como por ejemplo, que la carne importada estuviese afectada por la enfermedad de encefalopatía espongiforme bovina--comúnmente conocida como el mal de "las vacas locas." Nuestra expresión en esta ocasión se circunscribe a los hechos específicos en este caso.

[40] A luz del resultado a que llegamos en el día de hoy, es innecesario que discutamos qué otro tipo de actividad se subvencionaba con el Fondo, pues independientemente de lo anterior, es evidente que la campaña que se diseñó violaba el derecho a la libre expresión del peticionario. Se hace innecesario entonces discutir el segundo señalamiento de error que nos fuera presentado.

de expresión se ven amenazados cuando el gobierno obliga a sus ciudadanos, o a un grupo en particular, a subvencionar un mensaje que éste favorece.  En su consecuencia, el subsidio compelido establecido por la Ley Núm. 95, según diseñado e implantado, era violatorio del derecho a la libre expresión de los peticionarios según establecido en el Art. II, sec. 4, de la Constitución del Estado Libre Asociado de Puerto Rico.


                    Anabelle Rodríguez Rodríguez
                    Juez Asociada